Lyman H. Smith, J.
Plaintiff Finger Lakes Racing Association, Inc., (hereinafter, "FLRA”) moves this court for an order, pursuant to CPLR 3212, granting summary judgment on its underlying action for an accounting and for moneys due from *763 defendant under the betting distribution tables set forth in section 125 of New York’s Off-Track Pari-Mutuel Betting Law (L 1973, ch 346, § 4, as amd by L 1973, ch 347, § 4, eff May 21, 1973). Defendant Western Region Off-Track Betting Corporation (hereinafter "WROTE”) cross-moves for summary judgment, seeking dismissal of the complaint. WROTE argues that the issues presented herein should be disposed of administratively and that all concerned should await the anticipated promulgation by the New York State Racing and Wagering Board (hereinafter, "SRWB”) of the final rules and regulations interpreting the betting distribution schedules listed in section 125. WROTE also seeks joinder of other parties alleged to be necessary to a final determination of the questions presented herein.
In a nutshell, FLRA[1] charges that WROTE has failed to turn over to FLRA its statutory share of 1974 wagers taken in and retained by WROTE on various races conducted both in New York and out of State.[2] WROTE does not dispute such nonpayment, but claims that the statutory formulae set forth in section 125, providing for such disbursements to the various tracks, are not adequately defined and must be further clarified by the administrative action of the SRWB.
There being no dispute of the material and salient facts herein, this court is empowered to award summary judgment on the instant motion. (CPLR 3212, see, Indig v Finkelstein, 23 NY2d 728.)
It is first necessary, however, to briefly outline the factual circumstances upon which the present controversy has developed.
FLRA is incorporated as a thoroughbred racing association (the only one in the State which is not a nonprofit association) and, as such, operates Finger Lakes Race Track located in upstate Ontario County. It is situated within the statutorily *764 designated "Western Region”, one of eight geographical racing regions in the State, established by subdivision 1 of section 117 of the Off-track Pari-mutuel Betting Law. Also within the Western Region are two harness racing associations — one operating Buffalo Raceway and the other Batavia Downs.[3] Both of the latter harness racing associations are private corporations.
In 1973, the Legislature legalized off-track betting and created, within each "horse racing” region of the State, a regional off-track betting corporation to accept and disburse the proceeds of off-track wagering. These corporations were established as public benefit corporations. Defendant (WROTE) is such a corporation, serving the Western Region of the State.
Subject to guidelines set forth in section 121 of the Off-track Pari-mutuel Betting Law (L 1973, ch 346, § 4) these OTB corporations accept both regular and exotic wagers (see, § 117, subd 2) placed on thoroughbred and harness races conducted in and outside the State.
From the pari-mutuel pools resulting from public wagering on races (specified for such wagering) the OTB corporations make payments on winning tickets after retaining a percentage (designated, "the retained commission”, [§ 125 subd l]).3 [4]
Disposition of these retained commissions is governed by section 125 and includes OTB operating expenses and other liabilities contemplated by the statute, designated State taxes and specified percentages disbursed from such retained commissions to the tracks themselves i.e., the track holding the race and the "regional track”. (See, § 125, subd 1, pars [a], [b]).
While moneys due and owing from defendant WROTE to plaintiff FLRA on 1974 bets taken by the defendant oh FLRA races have concededly been paid, FLRA now contends, and WROTE does not deny, that moneys due on bets taken on out-of-region races have not been distributed to FLRA, as the "Regional Track”, pursuant to section 125 (subd 1, pars [a], [b]) in five specific wagering categories:
*765 (1) regular bets placed with WROTE on races run by nonprofit racing associations outside the Western Region during FLRA’s 1974 regional meet, from which total of the amount bet FLRA contends it is entitled to 2.5% (until the close of its meet on December 6, 1974);
(2) exotic bets placed with WROTE for the same races and period of time, from which total betting sums FLRA contends it is entitled to 4.5%;
(3) regular bets placed with WROTE on races run by nonprofit racing, associations out of the Western Region while neither FLRA nor Batavia Downs (the only two tracks in the Western Region’s "special district”) was conducting its annual meet, from which total bets FLRA contends it is entitled to .7%, i.e., 40% of 1.75% (see, § 125, subd 1, par [c], cl [ii]);
(4) exotic bets placed with WROTE for the same races and period of time, from which total bets FLRA contends it is entitled to 1.3%,[5] i.e., 40% of 3.25% (see, § 125, subd 1, par [c], cl [ii]);
(5) regular bets placed with WROTE on out-of-State races while FLRA was conducting its 1974 racing meeting, from which total bets FLRA contends it is entitled to 3.5% (see, § 125, subd 1, par [d], cl [iii]).
WROTB’s reason for not making such payments and distribution of moneys due and owing rests on the alleged confusion which it has experienced in making disbursements according to the statutory scheme of section 125. Claiming to be a mere "stakeholder” under CPLR 1006, it seeks to implead the operating associations of Batavia Downs and Buffalo Raceway, as well as the State Racing arid Wagering Board (SRWB) to whom it looks for interpretive resolution of the confusion purportedly inherent in section 125.
In passing, it may be noted that the SRWB on March 17, 1975 issued proposed rules and regulations defining section 125. The proposed rules and regulations were objected to by FLRA and others. To date, no final interpretive rules and regulations have been forthcoming. However, WROTE urges the court to delay distribution and determination of FLRA’s statutory share of the moneys concededly held by WROTE until such time as the SRWB promulgates its final definitive *766 regulations. It argues, in effect, that FLRA’s underlying action (commenced after objection was made to SRWB’s proposed guidelines) is premature on the ground that FLRA has failed to exhaust its administrative remedies.
While this court recognizes the possibilities of latent confusion which may result from a cursory reading of section 125, it is satisfied that the fair intendment of the Legislature is reasonably discernible from the wording and schematic arrangement of the statute. Accordingly, any further delay for administrative guidance is unnecessary.
There can be little argument that the SRWB has been created for the express purpose of overseeing all horse racing and pari-mutuel betting activities in the State. To that end, it has been given wide and far-reaching powers to administer and regulate all such activities. (See Racing and Wagering Board Law, § 201, subd 1; L 1973, ch 346, § 3.) Indeed, the Offtrack Pari-mutuel Betting Law prescribes that off-track parimutuel betting will be "conducted under the administration of the state racing and wagering board”, but "in the manner and subject to the conditions provided for in this article”. (OffTrack Pari-Mutuel Betting Law, § 116, ,L 1973 ch 346, § 4; emphasis supplied.)
Similarly, section 118 of the Off-Track Pari-Mutuel Law grants the SRWB "general jurisdiction over the operation of all off-track betting facilities within the state, and the board shall issue rules and regulations”, but again, "in accordance with the provisions of this article. ” (emphasis supplied.)
Thus, while the SRWB’s authority (as an administrative agency within the executive department) to generally administer and regulate racing and betting activities in this State is unquestioned, it is equally clear that it has not been granted original jurisdiction to establish distribution formulae differing from those intended by the Legislature in section 125. Where, as here, questions may arise as to the interpretation of the statutory provisions themselves, and to the Legislative intent, it is for the courts, not the SRWB, to render an interpretive ruling which gives effect to the statute.
As to the relief sought under statute by FLRA, this court finds little problem in applying the section 125 distribution tables, as established by the Legislature, in three of the five categories of the withheld wagering monies, to wit, in categories (3), (4) and (5) outlined above. Therefore, FLRA’s motion *767 for summary judgment on moneys due under categories (3), (4) and (5) is granted as hereinafter set forth.
Specifically, section 125 (subd 1, par [a]) read together with subdivision 1 (par [c], cl [ii]) thereof, makes it quite clear that from those regular and exotic bets placed with WROTE, and retained as commissions, on races run outside the Western Region by nonprofit associations from December 7 through December 31, inclusive — the only period when neither FLRA nor Batavia Downs was conducting its 1974 racing meeting— WROTE has the obligation to disburse 40% of the statutory formulas (1.75% for regular bets and 3.25% for exotic bets) to FLRA, as the only thoroughbred association in the Western Region.[6]
Thus (under category [3]), FLRA shall have summary judgment for .7% of the total sum of regular bets placed on said races and (under category [4]) 1.3% of the total sum of exotic wagers placed thereon.
Similarly (under category [5]), FLRA’s request for 3.5% of all regular bets placed with WROTE on out-of-State races run in 1974 on thoroughbred races, while FLRA was conducting its meeting, is clearly justified from a reading of section 125 (subd 1, pars [a], [d], cl [iii]), and accordingly, FLRA shall receive such withheld monies, less any contractual obligations owed to the out-of-State operators.
With reference to the initial two categories of withheld commissions (category [1] and category. [2]), outlined above, i.e., regular and exotic bets placed with WROTE on nonprofit association (NYRA) races run at Aqueduct, Saratoga and Belmont during FLRA’s 1974 meeting, the statutory distribution tables may reasonably be said to create some confusion as to the Legislature’s intent for distribution by WROTE.
The statute (§ 125, subd 1, pars [a], [b]) provides precise formulae[7] for distribution of the retained commission from *768 pools resulting from OTB regular or exotic bets, but fails to definitively state whether the designated "Regional Track” to receive such distributions means both thoroughbred and harness tracks, or merely means that track within the region which is identical in function (i.e. thoroughbred or harness) to the track where the races were held.
The problem of interpreting the statute may be simply stated by the following illustrative question:
When bets are placed with WROTE on thoroughbred races conducted at Belmont, Aqueduct or Saratoga — all thoroughbred tracks — are the WROTE moneys to be distributed only to FLRA (the only thoroughbred track in the Western Region) or, are such moneys to be paid proportionately to both thoroughbred and harness tracks in the Western Region?
It is this problem of statutory interpretation which has prompted WROTE to withhold moneys it agrees must ultimately be disbursed.
It is a basic tenet of our system of jurisprudence that, in the construction of statutes, courts of law must endeavor to "ascertain and give effect to the intention of the Legislature.” (McKinney’s Cons Laws of NY, Book 1, Statutes, § 92). "Our duty is to search out the intention of the” Legislature and to give effect to it when discovered though the expression be imperfect”. (103 Park Ave. Co. v Exchange Buffet Corp., 242 NY 366, 374, Cardozo, J.)
And the design of the Legislature must be given effect "though such a construction seems contrary to the letter of the statute.” (Allen v Stevens, 161 NY 122, 143; see also, People ex rel. Jackson v Potter, 47 NY 375.)
Thus, when legislative intent cannot be garnered from the plain words of the enactment, our courts must strive to construe the language of the statute "with reference to its subject-matter and the object sought to be obtained” by the enactment. (McKinney’s Cons Laws of NY, Book 1, Statutes, § 96; see also, Williams v Williams, 23 NY2d 592.)
It has long been our law that all parts of a statute are to be read and construed together to determine the legislative intent (McKinney’s Cons Laws of NY, Book 1, Statutes, §97) and that all parts must be harmonized with each other, as well as with the general intent, to give reasonable effect and meaning to the entire statute. (McKinney’s Cons Laws of NY, Book 1, Statutes, § 98.) So it is that a single word, a lone phrase or a general expression when detached from its context *769 will rarely reveal the whole statutory purpose (Chittenden Lumber Co. v Silberblatt & Lasker, 288 NY 396).
Nor should such a single word, phrase or expression "be torn from their places and, so isolated, be given a special meaning at variance with the general purpose and spirit of the enactment.” (McKinney’s Cons Laws of NY, Book 1, Statutes, § 97.)
Viewed in the light of the foregoing principles, it is clear that the column heading "Regional Track” (see, § 125, subd 1, par [a]) includes both the thoroughbred track (FLRA) and the harness tracks (Buffalo Raceway and Batavia Downs). This interpretation is consistent with the purpose and the design of the statute. This is what the statute is all about. Indeed, a careful review of the whole text of the statute confirms this conclusion.
Significantly, we read in the introductory language of subdivision 1 of section 125, preceding the distribution tables, the following definitive instruction:
"A 'regional meeting’ shall refer to either harness or thoroughbred meetings, or both. ” (Emphasis supplied.)
Obviously, by the use of such language, the Legislature evinced no desire, nor any plan, to limit a "regional meeting” to one form of track as opposed to another. It simply said "both”. It is especially significant that in the very next sentence the statute provides, "Quarter horse tracks shall not be 'regional tracks’ ”, but no similar exclusion, from the term "regional track” exists for either harness tracks or thoroughbred tracks. It belabors the obvious to say, that had the Legislature wished to limit the distribution of retained betting moneys realized on out-of-region races to one type of track or another it could have done so. But it did not. Indeed, the same sentence last quoted above closes with the following words: "if there are [sic] more than one harness tracks [sic] within a region, such tracks shall evenly divide payments made pursuant to the tables in paragraphs (a) and (b) when neither track is running.” Despite the garbled grammar of this latter sentence it creates the strongest inference that, when one harness track is running in a region, it is entitled to a statutory share of the retained commissions pursuant to the tables in subdivisions (a) and (b).
Finally, the Legislature’s even-handed and plural view of the two types of race tracks becomes abundantly clear in paragraph (c) of subdivision 1 of section 125, wherein it *770 provides for "the distribution of the retained commission to 'regional tracks’ ” of both types under the various circumstances dealt with under that subdivision.
The foregoing reasons and a reading of the statute as a whole compel the conclusion that (with reference to regular bets and exotic bets on races "out of region, during a regional meeting”) WROTB’s disbursement of retained commissions during FLRA’s 1974 regional meeting should be construed so as to distribute one half of the statutory formula to the thoroughbred track (FLRA) and the remaining one half to the two harness tracks in the region, the latter sums to be divided between the two harness tracks (Batavia and Buffalo) in exact proportion that the length of the latters’ 1974 race meetings bears in each instance to the 1974 FLRA meeting. This latter determination recognizes that neither harness track in the Western Region (Batavia Downs or Buffalo Raceway) holds race meetings at the same time, but that they alternate their racing seasons. Thus, the court’s final directive may also be stated as follows: Whenever a harness track meeting (Batavia or Buffalo) coincides with the thoroughbred meeting (FLRA) the open harness track and the open thoroughbred track will share equally the distribution of the retained commissions. Otherwise, distribution shall be made in accordance with the statutory tables and appropriate provisions of subdivision 1 of section 125.
Therefore, FLRA shall have summary judgment as to those three categories (above-indicated) wherein no interpretive confusion exists, and partial summary judgment (as to the first two categories) on bets placed during FLRA’s 1974 meeting in accordance with the court’s interpretation of section 125 set forth above.
WROTB’s cross motion for summary judgment dismissing the complaint and conferring upon the SRWB jurisdiction to interpret section 125 is hereby denied in all respects.
All moneys to be distributed to FLRA pursuant to this decision are to be paid, with accrued interest from April 1, 1975, within 30 days from the date WROTE receives notice of entry of the order herein. As for those moneys which, by dicta, are to be distributed to Buffalo Raceway and Batavia Downs, such sums shall be held in escrow by WROTE until such time as application is made by Buffalo Raceway and Batavia Downs for distribution of the same.
As a stakeholder under CPLR 1006, WROTE is hereby *771 released from any and all adverse and conflicting claims heretofore or hereafter made on the moneys distributed pursuant to this directive.

. Joining FLRA as a party plaintiff in this proceeding is the Finger Lakes Division of the "Horsemen’s Benevolent and Protective Association”. The Protective Association seeks derivative benefits from FLRA’s success in collecting monies from WROTE under subdivision 3 of section 125 of the Off-track Pari-mutuel Betting Law which, inter alia, provides that one half of the retained commissions paid by OTB corporations to racing associations (such as FLRA) shall be used "exclusively for the purpose of increasing purses” — a primary concern of the HBPA.

. Of interest, although not set forth in plaintiffs’ pleadings, is an agreement, dated May 22, 1974 between FLRA and WROTE wherein it is provided, "The Corporation agrees to pay FLRA the required Off-Track Pari-Mutuel Betting statutory percentages, and submit to FLRA 'daily statements’, on a weekly basis.”

. Within the Western Region there has also been created a special betting district, pursuant to subdivision 5 of section 121, which includes the entire region less the counties of Cattaragus, Chautauqua, Erie and Niagara. The "special district” thus includes the counties of Ontario, Monroe, Genessee, Orleans, Wyoming, Allegany, Livingston, Steuben, Wayne, Seneca, Schuyler, Chemung, Cayuga, Tompkins, Onondaga, Cortland and Yates. Both the Finger Lakes Track and Batavia Downs are situated within this special district, while Buffalo Raceway lies outside of it.

. Seventeen per cent of total wagers on regular betting pools and 25% of total wagers on exotic betting pools, plus the breakage (§ 125).

. All of these in-State races were conducted at Belmont, Aqueduct or Saratoga, each a thoroughbred track outside the Western Region, owned and operated by the New York Racing Association .(NYRA), a nonprofit racing association.

. There is no dispute that both FLRA and Batavia Downs did not operate from December 7 to December 31,1974 inclusive.

. Reproduction of the distribution tables set forth in subdivisions (a) and (b) of paragraph 1 of section 125 appears in pertinent parts as follows:'
Track Regional State
holding track tax
race
(a) Regular bets: Pools on races run by: Non-profit racing associations: * * * Out-region, during a regional meeting 1.00 2.50 1.10 *
(b) Exotic bets: Pools on races run by: Non-profit racing associations: * * * Out-region, during a regional meeting 2.00 4.50 3.10